## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

**ERIC TERRELL PORCHIA,**

Plaintiff,

**6:26-cv-01075-JWB-GEB**

v.

**MELISSA MEYER, individually and in her official capacity
as Court-Appointed Parenting Coordinator;
COLLABORATIVE SUCCESS, INC.;
JESSICA V. SUHR, individually and in her capacity as Attorney; and
THE BOARD OF COUNTY COMMISSIONERS OF SEDGWICK COUNTY, KANSAS,**

Defendants.

Case No. _____

### COMPLAINT FOR CIVIL RIGHTS VIOLATIONS

### 42 U.S.C. § 1983 — Equal Protection, Due Process, First Amendment

### 42 U.S.C. § 1985(3) — Conspiracy

### JURY TRIAL DEMANDED

## PRELIMINARY STATEMENT

Plaintiff Eric Terrell Porchia, a Black father, brings this action pursuant to 42 U.S.C. § 1983 and 42 U.S.C. § 1985(3) against the named Defendants for deprivation of his constitutional rights under color of state law.  On February 26, 2026, a court-appointed state officer told a Black father not to use the word custody. That instruction is on audio. It was delivered privately, was not entered into any session summary, and followed a formal written modification request submitted the same morning. The coordinator who gave that instruction had confirmed on the record nearly two years earlier that this father was not absent, that a structured pathway to equal parenting time existed in her practice, and that her threshold for a recommendation was approximately twelve months. Source: TR-0522. The threshold was crossed. No recommendation was made. The instruction was given instead. Source: TR-0226.  The appointment that produced this outcome was built on a fraudulent foundation. The attorney for

the opposing parent named this coordinator by name in the proposed parenting plan before any appointment process ran. She described the coordinator's credentials in terms the public record does not support. That credential representation — introduced through the appointing attorney's examination of her own client at trial — was the basis on which the court conferred binding quasi-judicial authority over this father's parental rights. No independent credential verification occurred. Source: E-0409REF; TR-0314; PC Order April 11, 2024.  The coordinator submitted a court report to Judge Dewey characterizing Plaintiff as non-compliant. Across the full engagement from April 11, 2024 through the date of this filing, she never produced a single written report to Plaintiff. PC Order Section 6 requires written reports when there is going to be a change in court order. That reporting obligation produced nothing for the party most directly affected for nearly two years. The payment history she submitted to support that court report contains three written attributions of statements Plaintiff did not make. The email thread she attached to the same submission refutes every one of them. Her own billing records contradict her compliance narrative: the same office that characterized Plaintiff as non-compliant issued invoices showing a positive balance with the commendation "Thank you for your commitment and keep up the good work" — including on the date she billed his own retainer for a child interview whose report she then withheld from him. A state actor submitted a document to a judicial officer that is contradicted by its own exhibits. Source: INV-3787; INV-3901; E-0325MB; PC Order Section 20.  She acknowledged the constitutional injury in her own words. On March 25, 2026, she wrote: "I believe that it is important for you to be active and included in PC. Every effort has been made on this end to ensure that you are able to do so." She then excluded him because he did not have $450. A state actor who acknowledges that a parent's participation in a court-ordered process is important and desirable, and then conditions that participation on payment, has stated the Griffin violation herself. Wealth cannot be the determinant of access to a proceeding affecting fundamental parental rights. Griffin v. Illinois, 351 U.S. 12 (1956); M.L.B. v. S.L.J., 519 U.S. 102 (1996). Source: E-0325MB.  The coordinator disclosed on the record that her doctoral program is a doctrinal Christian program — her world framework, the lens through which she processes all things — and that she consulted a pastor before an official court-connected session. Source: TR-0806. She recommended Christian institution enrollment for a biracial child over the Black father's documented objection and applied that undisclosed framework to official determinations affecting this child's religious

formation without Plaintiff's knowledge or consent. The Establishment Clause does not suspend when authority is delegated to a private officer.  The county that appointed her did so through a mechanism controlled by the opposing parent's attorney. That coordinator was already the developer and instructor of the mandatory co-parenting class every divorcing family in Sedgwick County is required to attend — confirmed on CSI's own public website. The county created that prior business relationship through its own mandatory program infrastructure, then appointed the same officer as a neutral without independent conflict review. The court delegated authority, required reporting as the oversight mechanism, and never verified that mechanism was functioning. Nearly two years of binding quasi-judicial authority over this father's fundamental parental rights operated without a single formal report reaching him. Source: collaborativesuccess.com; TR-0522; PC Order Section 6.  No allegation in this complaint requires the Court to credit inference over evidence. The constitutional violations are established by the Defendants' own timestamped written communications, billing records, and session transcripts — and by an audio recording of the session in which the core violation occurred. The record proves itself.  Plaintiff appears pro se. This complaint is entitled to liberal construction under Haines v. Kerner, 404 U.S. 519 (1972). Plaintiff proceeds pursuant to 28 U.S.C. § 1654.

On February 26, 2026, Plaintiff went to Meyer's office to address a billing matter with administrative staff. Administrative staff facilitated a session with Meyer. Plaintiff raised documented concerns about the minor child's academic performance and the child welfare situation that had been building. Meyer's response, delivered privately and not entered into any session summary: "I think rather than saying anything, I would not use the C word. of custody." Source: TR-0226. The factual background that follows documents how that outcome was produced.

Plaintiff appears pro se. Kerner, 404 U.S. 519 (1972). Plaintiff proceeds pursuant to 28 U.S.C. § 1654.

## I. JURISDICTION AND VENUE

**1.** This Court has federal question jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343 over claims arising under 42 U.S.C. § 1983, 42 U.S.C. § 1985(3), and the Fourteenth and First Amendments to the United States Constitution.

**2.** Venue is proper in the District of Kansas pursuant to 28 U.S.C. § 1391(b) because all relevant events occurred in Wichita, Kansas, and Defendants reside and conduct business in this district. This Court has supplemental jurisdiction over related state law claims pursuant to 28 U.S.C. § 1367.

**3.** The underlying state court matter is Case No. 2021-DM-004560, pending in the 18th Judicial District Court, Sedgwick County, Kansas. Plaintiff maintains residences in both Wichita, Kansas and Kansas City, Missouri. The Wichita residence is the minor child's documented home with Plaintiff and has been maintained throughout the relevant period. Plaintiff traveled between residences to exercise parenting time with both of his children. In December 2024, Meyer directed that exchanges would occur at the Emporia Braum's, characterizing it as a temporary plan tied to Plaintiff's job situation. Source: E-1220. That arrangement has remained in place through the date of this filing without a written determination that the conditions requiring it have changed or been resolved. This action does not seek review of any state court judgment. It seeks relief for independent constitutional violations committed under color of state law.

## II. PARTIES

**4.** Plaintiff ERIC TERRELL PORCHIA is a Black male residing in Wichita, Kansas and is the Respondent/Father in Case No. 2021-DM-004560. He is the father of minor child N.J.P., born July 2019. He has been assigned parenting time Meyer characterized on May 22, 2024 as approximately 18 percent. Source: TR-0522. He appeared pro se at the hearing at which that plan was approved.

**5.** Defendant MELISSA MEYER is an individual residing in and conducting business in Wichita, Kansas. At all relevant times she served as the court-appointed Parenting Coordinator pursuant to the PC Order entered April 11, 2024, sued in both her individual and official capacity. Her publicly listed credentials are a Bachelor of Arts in Psychology, Religion and English and a Master of Arts in Human Resources and Industrial Relations. She is enrolled in a doctoral program at a Christian institution — in progress at the time of her appointment — which she disclosed on the record as a doctrinal Christian program constituting her world framework, the lens through which she processes all things. Source: TR-0806. That framework was not disclosed at appointment, was not authorized by any governing instrument, and was applied to official determinations affecting Plaintiff's parental rights without his knowledge or consent.

Business address: Collaborative Success, Inc., 550 N. 159th Street East, Suite 320, Wichita, KS 67230.

**6.** Defendant COLLABORATIVE SUCCESS, INC. (CSI) is a Kansas business entity at 550 N. 159th Street East, Suite 320, Wichita, KS 67230. Meyer is President and CEO. CSI administered the billing structure, fee schedule, and operational framework through which the constitutional violations were carried out. CSI is directly liable for the conduct alleged through its officer and owner. CSI has no immunity defense.

**7.** Defendant JESSICA V. SUHR, Bar No. 22220, Ward Law LLC, 8415 East 21st Street North, Suite 250, Wichita, KS 67206, served as attorney for Petitioner Kaleigh Porchia. She is sued in her individual capacity for: naming Meyer by name in the proposed parenting plan before any appointment process; describing Meyer's credentials in terms the public record does not support; controlling the administrative referral that completed the appointment; entering the Ortega conciliation report into evidence under procedural conditions that prevented the court from using it against her submissions; and petitioning for collection mechanisms against Plaintiff with no parallel in standard Kansas judgment practice. Each basis for Suhr's liability is independently pleaded and independently sourced. One does not depend on another.

**8.** Defendant THE BOARD OF COUNTY COMMISSIONERS OF SEDGWICK COUNTY, KANSAS is the legal entity through which Sedgwick County may sue and be sued under K.S.A. § 19-105. The 18th Judicial District Court of Sedgwick County entered the PC Order on April 11, 2024. The Board is named for purposes of the Monell claim pursuant to Monell v. Department of Social Services of New York, 436 U.S. 658 (1978). Service: Sedgwick County Counselor's Office, 525 N. Main Street, Suite 359, Wichita, KS 67203.

## III. FACTUAL BACKGROUND

### A. The Compromised Foundation

**9.** The parenting plan filed March 4, 2024 was drafted by Defendant Suhr with no competing plan before the court. The 18th Judicial District Court had referred the matter to Domestic Conciliation. Stacy L. Ortega submitted her report on June 6, 2023 following nine months of work with the parties. That report was sent to the parties. At trial, Suhr moved to enter the report into evidence. The report was entered. But the procedural posture Suhr's submission strategy had created — Plaintiff unrepresented, no pretrial order raising the conciliation recommendations —

meant the report could not be used to contradict her plan. Suhr introduced evidence under procedural conditions that prevented the court from using it to contradict her plan. The court adopted her plan as the only document before it. The documented deviations from the conciliation recommendations disadvantaged the unrepresented Black father. Source: March 14-15, 2024 trial transcript; Ortega Report June 6, 2023.

**10.** The plan imposed housing documentation obligations exclusively on Plaintiff. Paragraphs 5(d), 5(f), 5(j), and 5(l) require Plaintiff to provide lease or mortgage documentation and photographs of required furnishings. No equivalent obligation is imposed on Petitioner/Mother anywhere in the plan. Paragraphs 5(m) through 5(r) created a tier reducing Plaintiff to day visits only if he lacked a qualifying residence — a condition without parallel in Kansas family law standards applied exclusively to the unrepresented Black father in a case involving a biracial child. Source: Parenting Plan March 4, 2024.

**11.** Paragraph 14 of the court-approved plan states: "The Court shall appoint Melissa Meyer as parenting coordinator." Suhr named Meyer specifically before any appointment process. On April 9, 2024, Suhr emailed Lorrie Seltzer directing incorporation of her own plan terms and specifying a 36-month term. The PC Order was entered April 11, 2024 specifying a 24-month term. Suhr had a documented professional relationship with Meyer she disclosed on May 22, 2024. No recusal, no court notification, and no written waiver from Plaintiff followed. At trial, Plaintiff specifically requested both parties be permitted to submit candidates. That request was not accommodated. Source: E-0409REF; PC Order April 11, 2024.

**12.** At the time of Meyer's appointment, CSI held a pre-existing business relationship with the 18th Judicial District Court through CSI's role as provider of the court-mandated co-parenting education required of all divorcing parties in Sedgwick County — including the Kids First Workshop, which Meyer co-authored and teaches. CSI's own public website states the Kids First Workshop was "Developed and taught by Melissa Meyer." The 18th Judicial District Court's website confirms the Kids First Workshop is a court-ordered class scheduled at the Sedgwick County Courthouse. Source: collaborativesuccess.com; dc18.org/copy-of-family-law-self-help; TR-0522. That prior business relationship was not disclosed in the PC Order and was not independently reviewed before Meyer was conferred binding quasi-judicial authority. Suhr selected an appointee already embedded in the court's own mandatory program infrastructure.

Removing Meyer without addressing CSI's institutional relationship with the court does not remedy the structural conflict.

**13.** On May 22, 2024, Meyer confirmed on the record that Plaintiff's housing situation did not present a concern. Source: TR-0522. The PC Order had cited Plaintiff's living situation as a basis for intervention. That factual predicate was resolved on day one. Meyer took no steps to modify the plan, remove the housing clause, or initiate any proceeding reflecting that resolution. The housing clause remained operative. The appointment continued. From May 2024 through December 2024 Plaintiff maintained parenting time while traveling between Wichita and Kansas City — maintaining dual residences to be present for both of his children. In December 2024 the meeting location was adjusted to reflect his Kansas City residence. Meyer characterized that adjustment as a material change to Petitioner/Mother, then imposed a three-month window with no stated objective. As of the date of this filing the plan has not been amended, the housing clause remains operative, and Plaintiff maintains his Wichita residence. The clause has no factual basis in the documented record. Its continued presence creates a judicially sanctioned characterization that precedes Plaintiff in every future proceeding without the corrective context Meyer's own May 22, 2024 confirmation would provide. Source: PC Order April 11, 2024; TR-0522.

**14.** On May 22, 2024, Meyer stated on the record: "Judge Dewey has given me latitude to do this in PC, here's my experience with the parents, here are the ongoing issues, this is my recommendation for parenting time to solve these ongoing issues — I can do that but I can't do it till I've got a fairly good track record and that means probably at least 12 months." Source: TR-0522. That statement established that the pathway to modification existed; that Judge Dewey had a documented prior pattern of granting Meyer latitude in PC proceedings as a standing practice; and that the threshold was approximately 12 months. The engagement ran from April 11, 2024 to the date of this filing — nearly twice the stated threshold. No recommendation was made. The pathway described on day one was suppressed on February 26, 2026.

**B. The Payment-Gated Access Structure**

**15.** Meyer conditioned Plaintiff's access to court-ordered PC functions on payment compliance the PC Order does not authorize. PC Order Section 3 identifies the remedy for non-payment as sanctions through a court proceeding on motion — not unilateral exclusion, not service

cancellation, not conditioning of participation on payment. Meyer stated in writing on March 23, 2026: "Your non-payment constitutes non-participation in the PC process as per the Court order." Source: E-0323MB. The PC Order does not contain that provision. A state actor who substitutes a private agreement for a court order and presents the private agreement's terms as carrying judicial authority misrepresents the source and scope of her delegated power. This is a component of the due process deprivation in Count II.

16. Meyer's office approved a biweekly payment plan in November 2024 as sufficient to maintain Plaintiff's participation in the process. No written modification cancelling or superseding that plan was provided to Plaintiff. Plaintiff relied on those terms. Meyer subsequently applied a higher payment standard retroactively — conditioning access on a retainer requirement exceeding what the approved plan established, without written notice. The February 26, 2026 invoice confirmed a balance due of $0.00 while simultaneously demanding $500 for the next retainer. Source: INV-3901. As of the date of this filing, Plaintiff has not received documentation confirming a negative balance. Thirteen days after issuing an invoice showing a zero balance with the written commendation "Thank you for your commitment and keep up the good work," Meyer submitted a non-compliance characterization to the court built on that same invoice. An administrative staff member confirmed on February 26, 2026 that $500 would cover the next joint session, the summer determination, and the email review. Source: INV-3901; E-0929MK; February 26, 2026 administrative communication.

17. Access to the court-ordered parenting coordination process was conditioned on Plaintiff's payment compliance to a private business — not on the terms of the court order that created the process. A parent whose payments do not meet a privately set retainer threshold cannot attend joint sessions, cannot contest findings, cannot shape the official record, and enters every future proceeding against a record built without him. The financial access barrier systematically transferred control of the official record to the party with greater financial resources. Wealth cannot be the determinant of access to a proceeding affecting fundamental parental rights. This is a component of the equal protection deprivation in Count I and the due process deprivation in Count II. On March 25, 2026, Meyer demanded $450 by 10:30 AM, less than one hour after sending the demand, threatening to exclude Plaintiff from the joint session scheduled for March 26, 2026 where the teacher meeting summary will be presented. Plaintiff had submitted a payment the same morning per the November 2024 payment plan. Meyer's response was to

demand the remainder within one hour or lose access to the session. The payment-gated exclusion mechanism is not historical. It remained active as of the date of this filing. Source: E-0325MB; Plaintiff email to Meyer, March 25, 2026.  Even if Meyer held contractual authority to condition services on payment — which the governing documents do not support — that authority cannot survive constitutional scrutiny when applied to access to a court-ordered proceeding affecting fundamental parental rights. Griffin v. Illinois, 351 U.S. 12 (1956); M.L.B. v. S.L.J., 519 U.S. 102 (1996). Meyer herself acknowledged the constitutional injury in her own words on March 25, 2026: "I believe that it is important for you to be active and included in PC. Every effort has been made on this end to ensure that you are able to do so." She then excluded him because he did not have $450. A state actor who acknowledges that a parent's participation in a court-ordered process is important and desirable, and then conditions that participation on payment, has stated the Griffin violation herself. Wealth cannot be the determinant of access to a proceeding the coordinator herself described as important for him to be part of. The constitutional violation is not the contract. It is the effect of the contract on a parent's ability to participate in a process the state ordered him to participate in — documented in the coordinator's own words on the morning she locked the door. Source: E-0325MB.

18. Across the engagement from April 11, 2024 through the date of this filing, Meyer produced no written reports under PC Order Section 20 to Plaintiff, issued no formal directives, and made no formal findings transmitted to Plaintiff. PC Order Section 20 requires written reports when there is going to be a change in court order or additional court order. PC Order Section 23 requires fees to be based on actual time expended relating to disputes between the parties. The fees collected were not connected to the court-ordered work product the appointment required. Reports Plaintiff specifically requested were withheld and conditioned on payment — including a report on Meyer's meeting with the minor child, conducted November 25, 2025 and withheld through the date of this filing. That interview was billed on November 25, 2025 and paid from Plaintiff's own retainer balance on December 1, 2025 — the same invoice that confirmed $209.25 remained on retainer. Plaintiff funded the interview that produced the report he was never shown. The confirmed positive balance ran from December 1, 2025 ($209.25 on retainer, INV-3787) through January 27, 2026 ($143.87 confirmed, INV-3835) through February 26, 2026 when the remaining balance was consumed by charges from Plaintiff's unscheduled in-person visit (INV-3901). The report was withheld across that entire period — nearly three

months — while funds sat on account unused. Source: INV-3787; INV-3835; INV-3901; PC Order Sections 3, 20, 23. Joint sessions were cancelled while Plaintiff's confirmed account balance of $143.87 was $6.13 short of the $150 threshold Defendants' own office confirmed was required for a joint session. Source: E-0929MK; INV-3835. The absence of reports and formal findings deprived Plaintiff of notice of the official record being built about his case and his daughter.

## C. The Pattern of Asymmetric Enforcement

**19.** Meyer applied the plan's burdens against Plaintiff and declined to enforce its protections on his behalf. The no-recording clause Meyer invoked against Plaintiff in December 2024 does not appear in the court-approved parenting plan. It appears in the PC Agreement — a private document drafted by Meyer. Meyer enforced this private contractual provision against Plaintiff while not enforcing it against herself — she used Otter.ai to generate verbatim recordings throughout the engagement — and not enforcing it against Petitioner/Mother, who used Otter.ai to record the April 3, 2025 joint session and shared that recording without consequence. In November 2024, Meyer accepted a third-party transcript submission from Petitioner/Mother for court files without applying the same verification standard she later used to exclude Plaintiff's documentation. Source: TR-1118; E-0403OT; E-0312; November 2024 session record. Meyer's use of Otter.ai to record court-connected sessions involving sensitive family law matters — including child welfare assessments, mental health discussions, and co-parenting strategy — without adequate disclosure of how those recordings are stored, accessed, or protected, raises additional concerns about the security of information collected under color of a court appointment. Source: TR-1118.

**20.** Meyer stated in writing on March 12, 2026: "I also must verify firsthand information from a 3rd party." Source: E-0312. That standard was cited against Plaintiff's audio documentation. On March 11, 2026, Meyer met independently with the minor child's teacher for one hour without Plaintiff's presence or participation. On March 23, 2026, she disclosed she had prepared a summary of that meeting for presentation at a joint session Plaintiff could not attend. Source: E-0323MB. The verification standard was invoked against Plaintiff's audio documentation and written transcript. It was not invoked when Meyer used third-party information as the basis for an official finding.

**20a.** In the February 26, 2026 session, Meyer recommended a specific individual therapist by name to Petitioner/Mother as a resource for managing co-parenting dynamics — providing Petitioner/Mother individualized therapeutic referral resources while in the same session delivering the C-word instruction to Plaintiff. The same session in which Plaintiff's petition right was suppressed was the session in which Petitioner/Mother received individualized professional referral resources from the court-appointed coordinator. This asymmetric provision of resources is a component of the equal protection deprivation in Count I. Source: TR-0226.

**21.** Plaintiff holds joint legal custody of the minor child under the court-approved parenting plan. Joint legal custody requires consultation with both parents on major decisions including educational decisions. The minor child had been placed in an academic intervention group. Plaintiff submitted documented evidence of the minor child's academic status. Meyer met independently with the minor child's teacher without Plaintiff's participation and prepared findings for presentation at a session Plaintiff could not attend, without providing Plaintiff the summary in advance despite his written request. Source: E-0323MB; E-0325MB.

**22.** Meyer used Otter.ai to record court-connected sessions throughout the engagement. Those recordings are the official evidentiary record of the sessions she conducted. Litigation hold obligations attached no later than August 12, 2025 — the date Plaintiff notified Meyer in writing of his intent to file a restraining order and asked how that proceeding would impact the PC process. Source: E-0812RO. Any deletion or expiration of those recordings after that date constitutes spoliation of evidence in anticipated litigation. If session summaries Meyer produced do not accurately reflect the content of the recordings, those summaries constitute a falsified official record submitted through court-sanctioned channels. Plaintiff intends to seek production of all Otter.ai account data, recordings, access logs, and deletion logs through discovery. A preservation order is requested in the PI motion filed simultaneously with this complaint. Source: E-0312; TR-1118; E-0223; E-0226.

### D. The Religious Framework

**23.** On August 6, 2025, Meyer disclosed on the record that "my belief system" guided her function and that her doctoral program is a doctrinal Christian program constituting her world framework, the lens through which she processes all things. She stated she had consulted a pastor before the August 6, 2025 session. Source: TR-0806; TR-0805. Official determinations affecting

Plaintiff's parental rights, his daughter's religious formation, and his protected expression were made through that undisclosed framework without his knowledge or consent. A state actor who prepares for official court-connected sessions through pastoral consultation and delivers that pastoral guidance as official determinations does not hold a reasonable belief that her conduct is constitutionally appropriate. This is the Establishment Clause violation alleged in Count III and evidence bearing on the qualified immunity analysis.

**24.** Meyer recommended the minor child's enrollment at a Christian institution over Plaintiff's documented objection, endorsed Christian church enrollment through the court-sanctioned OFW platform, and applied doctrinal frameworks to co-parenting determinations. Source: E-0813; TR-0806; OFW record. The mandatory co-parenting class CSI administers for the 18th Judicial District Court — which every divorcing family in Sedgwick County is required to attend — was co-authored by Meyer. Source: TR-0522. The county's mandatory education program for all divorcing families is delivered through CSI under Meyer's authorship. That institutional relationship is a component of the training failure alleged in the Monell claim.

**E. The Petition Suppression and C-Word Instruction**

**25.** On February 23, 2026, Plaintiff submitted a consolidated concerns document to Meyer identifying recurring patterns affecting his ability to participate in decision-making and requesting specific agenda items for upcoming meetings, including evaluation of whether the parenting plan required modification. Source: E-0223. He received no response. On February 26, 2026, at 12:32 AM, Plaintiff submitted a formal ten-section written parenting time modification request explicitly requesting restoration of a 50/50 parenting schedule and directives to support consistent co-parenting. Source: E-0226. He requested confirmation of receipt in both submissions. Neither was acknowledged. Later that day Plaintiff went to Meyer's office to address a billing matter with administrative staff. Administrative staff facilitated a session with Meyer. Source: TR-0226. Plaintiff raised documented concerns about the minor child's academic performance and the child welfare situation that had been building.

**26.** Meyer's response to Plaintiff's formal modification request and child welfare concerns, delivered privately and not entered into any session summary: "I think rather than saying anything, I would not use the C word. of custody." Source: TR-0226. In the same session, Meyer indicated she would contact Petitioner/Mother to share educational strategies from the session —

framing it as a routine touchbase to Petitioner/Mother — without disclosing the C-word instruction. The court-appointed coordinator who described the modification pathway on May 22, 2024, who named a 12-month threshold, whose engagement had run from April 11, 2024 through February 26, 2026 — told the parent presenting a documented child welfare crisis not to use the word that names the remedy. That instruction is not a procedural dispute. A state actor orally suppressing the clearly established constitutional right to petition for modification of a court order affecting a parent's fundamental liberty interest — confirmed not absent by the coordinator herself — has no adequate state remedy. The coordinator controls the state record. Her instruction is in it. The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury. Elrod v. Burns, 427 U.S. 347 (1976). Outstanding coordination obligations — including the summer parenting determination and the child interview report — remained undischarged after the February 26, 2026 session. The federal forum is not an alternative. It is the forum the Constitution requires.

### F. Documented Retaliation Pattern

27. Before February 26, 2026: no written all-parties recording consent standard appeared in any communication; no automatic court reporting threat had been made in writing; Meyer had not disclosed scheduling an independent meeting with the minor child's teacher. After February 26, 2026: the all-parties recording consent standard was stated in writing for the first time on March 12, 2026; Meyer disclosed on March 11, 2026 that she had scheduled an independent teacher meeting, and confirmed on March 23, 2026 that the meeting had occurred; Meyer stated in writing that non-payment constitutes non-participation as per the Court order; and Meyer characterized Plaintiff as demanding meetings without evidentiary basis in the record she controlled. Source: E-0312; E-0323MB; E-0311SCHOOL. The variable between the two periods is Plaintiff's exercise of his documented right to petition for modification. This temporal pattern is a component of the First Amendment retaliation claim in Count III.

## IV. STATE ACTOR STATUS

28. Meyer exercised authority conferred by a court order. The PC Order appointed her, granted her qualified quasi-judicial immunity, specified she serves under the direction and control of the court, and authorized binding determinations affecting Plaintiff's parental rights. She acted under color of state law. West v. Atkins, 487 U.S. 42 (1988). Meyer confirmed the judicial framework

of her role on May 22, 2024 when she described Judge Dewey's standing practice of granting her latitude to bring parenting time modification recommendations in PC proceedings. Source: TR-0522.

**29.** CSI has no immunity defense. It is the corporate entity through which state-delegated authority was administered and through which the billing structure conditioning access to court-ordered functions was imposed. Its direct institutional liability attaches through its officer and owner.

**30.** Suhr acted under color of state law when she controlled the administrative appointment process for a court-delegated officer, drafted plan terms submitted to and adopted by the court, and petitioned the court for collection remedies. Dennis v. Sparks, 449 U.S. 24 (1980).

## V. CAUSES OF ACTION

### Count I — Equal Protection (42 U.S.C. § 1983)

**Against All Defendants**

**31.** Plaintiff incorporates all preceding paragraphs. The Equal Protection Clause prohibits state actors from applying laws and processes discriminatorily based on race, gender, or wealth. The violations documented here operate across all three dimensions. Each dimension is independently actionable.

**32.** Race: Plaintiff is a Black father. The plan was drafted by opposing counsel and adopted without a competing submission from the unrepresented Black father. The documented deviations from the conciliation recommendations disadvantaged Plaintiff. The C-word instruction suppressed the constitutional right of a Black father whose parenting time Meyer herself characterized as approximately 18 percent. The instruments embedded in the court-adopted plan — housing documentation requirements, furnishing photograph obligations, and tiered parenting time reductions conditioned on housing stability — were applied exclusively to the unrepresented Black father and mirror documented structural barriers disproportionately imposed on Black fathers in family court proceedings. Meyer possessed the housing clause instrument from the date of appointment. She confirmed on May 22, 2024 that the factual predicate did not exist. Source: TR-0522. She held it dormant for 14 months. She activated it on January 23, 2026 by inserting herself without invitation into a routine parenting time

communication between the parents — neither of whom had requested her involvement — to raise the housing clause as a compliance issue for the first time. Source: Parenting Plan March 4, 2024; TR-0522; E-0123WX. Meyer stated in writing that she is considering the culture of both homes in the summer determination — invoking culture as a planning factor without neutral definition or symmetric application. Source: TR-0522; TR-0226; TR-0806; E-0813; March 14-15, 2024 trial transcript.

**33.** Gender: Meyer was aware on May 22, 2024 of a public review characterizing her practice as biased against male parties. She acknowledged it and dismissed it without engagement. Source: TR-0522. The documented pattern across the engagement — no enforceable directive in Plaintiff's favor, recording standard applied against Plaintiff and not Petitioner/Mother, Petitioner/Mother's concerns generating agenda items while Plaintiff's generated deferrals — is consistent with that notice.

**34.** Wealth: Petitioner/Mother had retained counsel throughout. Plaintiff had a payment plan. The official record was shaped by the party with greater financial resources. The investment restriction sought and entered in September 2024 — prohibiting Plaintiff from contributing to investment accounts while his obligations continued — has no parallel in standard Kansas judgment collection practice and constitutes a court-enforced wealth ceiling. The trading performance records submitted at trial reflected only the post-separation period during which the financial conditions of this litigation had altered Plaintiff's investment approach. The pre-separation trading performance that would have provided context was not submitted. The right to equal access to judicial proceedings affecting parental rights, free from wealth-based barriers, was clearly established before 2024. Source: MOJ August 28, 2024; Trial record March 14-15, 2024; Griffin v. Illinois, 351 U.S. 12 (1956); M.L.B. v. S.L.J., 519 U.S. 102 (1996).

### Count II — Due Process (42 U.S.C. § 1983)

**Against All Defendants**

**35.** Plaintiff incorporates all preceding paragraphs. The Due Process Clause protects Plaintiff's fundamental liberty interest in the care, custody, and management of his child. Troxel v. Granville, 530 U.S. 57 (2000). That interest cannot be significantly restricted without constitutionally adequate process. Mathews v. Eldridge, 424 U.S. 319 (1976).

**36.** Procedural due process was violated at appointment: The qualification finding was entered administratively, without adversarial process, based on a credential description the public record does not support. Plaintiff had no meaningful opportunity to contest Meyer's qualifications, the disclosed conflict, or the terms of the appointment. Source: E-0409REF; PC Order April 11, 2024.

**37.** Procedural due process was violated throughout the engagement: Meyer produced no written reports under PC Order Section 20 to Plaintiff across the engagement. Plaintiff was subject to binding quasi-judicial determinations affecting his parental rights without notice of the official record being built about his case. Reports Plaintiff requested were withheld while his account had a positive balance. Meyer met independently with a teacher to form findings without Plaintiff's participation and prepared those findings for a session he could not attend. Source: PC Order Section 20; INV-3901; E-0323MB.

**38.** Substantive due process was violated: The C-word instruction — suppressing the petition right of a parent the coordinator confirmed was not absent, after an engagement running from April 11, 2024 through the date of this filing — is an arbitrary deprivation of a fundamental liberty interest that cannot survive any level of constitutional scrutiny. The absence of a directive, trial, or formal finding in Plaintiff's favor across the full engagement is not a neutral administrative outcome. A directive is a formal written determination with binding effect. A trial is a structured exploration that produces no enforceable outcome on its own. The engagement produced neither.

**38a.** The court-bound record Meyer is now building contains written attributions of statements to Plaintiff that Plaintiff states are false and that are contradicted by audio recordings in his possession. Source: E-0325MB. Meyer declined to review the audio. She submitted characterizations of what Plaintiff said without reviewing the primary evidence that would have contradicted them. The mischaracterization is documented within the same submission Meyer prepared for the court. Her March 25, 2026 payment history contains three "Eric stated" attributions. Each is refuted by the email thread she attached to the same submission. First: the payment history characterizes Plaintiff's March 11 email as stating non-compliance. That email disputes Meyer's payment characterization and does not state non-compliance. Second: the payment history states Plaintiff's March 24 email stated he would pay $500. That email states

only that he is submitting a payment. Meyer's own reply asks whether it is $500 — she had to ask because he did not say so. Third: the payment history omits Plaintiff's March 25 email at 10:30 AM entirely — sent thirty-six minutes after her ultimatum, documenting his payment and his stated intention to attend. The thread is the refutation. She submitted both. Source: E-0325MB.

**38b.** The mischaracterization pattern is not confined to the March 25 payment history. Across the engagement Meyer consistently reframed Plaintiff's documented written submissions as demands, confusion, or misinterpretation. This directional pattern, applied consistently to a Black father whose parenting time Meyer herself characterized as approximately 18 percent, is a component of the equal protection deprivation in Count I. The direction of the pattern is documented across the full engagement. It did not reverse. The injury from a falsified official record is not remedied by subsequent challenge. Judge Dewey cannot unread what Meyer submits. Every future proceeding begins from a record that already contains Meyer's characterizations. The contamination is permanent from the moment the report is filed. Source: E-0325MB; PC Order Section 6; TR-0522.

**39.** Meyer's written statement that non-payment constitutes non-participation as per the Court order is a misrepresentation of the source of her authority. PC Order Section 3 is the governing instrument. It does not authorize that policy. A state actor who substitutes a private agreement for a court order and presents the private agreement's terms as carrying judicial authority produces a process that excludes Plaintiff from court-ordered functions through an unauthorized mechanism, depriving him of procedural due process. Source: E-0323MB; PC Order Section 3.

### Count III — First Amendment (42 U.S.C. § 1983)

**Against Defendants Meyer and Collaborative Success, Inc.**

**40.** Plaintiff incorporates all preceding paragraphs. The First Amendment protects the right to petition for redress of grievances and prohibits government establishment of religion. Each violation is independently actionable.

**41.** Petition suppression: On February 26, 2026, Meyer orally instructed Plaintiff not to use the word custody during a court-connected session that followed Plaintiff's submission of a formal written modification request earlier that morning. Source: TR-0226. The right to petition for modification of a court order affecting parental rights is clearly established. No reasonable state

actor could believe that orally suppressing that right in a court-connected proceeding was constitutionally permissible. The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury. Elrod v. Burns, 427 U.S. 347 (1976). The retaliation pattern that followed — documented pressure mechanisms activating after Plaintiff's petition exercise and not before — is a component of this count. Source: TR-0226; E-0312; E-0323MB.

**42.** Establishment Clause: Meyer disclosed that a doctrinal Christian program is her world framework. She consulted a pastor before the August 6, 2025 court-connected session. She applied theological determinations to official co-parenting decisions affecting Plaintiff's parental rights and his daughter's religious formation. Source: TR-0806; TR-0805. The Establishment Clause prohibits government entanglement with religious authority in the exercise of state-delegated power over citizens' fundamental rights. Lemon v. Kurtzman, 403 U.S. 602 (1971). This violation is independently established.

**43.** Recording suppression: Meyer cited an all-parties recording consent standard for the first time on March 12, 2026 against Plaintiff's audio documentation. Source: E-0312. The recordings were lawfully made. The no-recording clause is unenforceable on three independent grounds. First, Kansas is a one-party consent state. K.S.A. 21-6101 controls. A private contract cannot override state law on recording consent. Second, Meyer voided any force the clause carried through her own conduct — she used Otter.ai to record court-connected sessions throughout the engagement while the clause was in effect. A party cannot enforce a no-recording clause against the other party while simultaneously recording under that same clause. Source: TR-1118. Third, the all-parties consent standard Meyer invoked on March 12, 2026 was stated in writing for the first time after the sessions it was applied to exclude. Source: E-0312. A standard that did not exist when the recordings were made cannot be retroactively applied to exclude them. The asymmetric application of an invented, retroactive, and self-voided standard is a component of the First Amendment and equal protection violations.

### Count IV — 42 U.S.C. § 1985(3) Conspiracy

**Against All Defendants**

**44.** Plaintiff incorporates all preceding paragraphs. Section 1985(3) prohibits conspiracies to deprive any person of equal protection of the laws. The conspiracy is established through the

sequence of documented acts connecting the same professional network from March 4, 2024 through the date of this filing.

**45.** Suhr named Meyer specifically in the proposed parenting plan before any appointment process. Suhr described Meyer's credentials in terms the public record does not support — and holds a psychology background that informed what a clinical mental health credential requires. Source: WEB-WL. Suhr controlled the administrative referral, directing incorporation of her own plan terms. Meyer disclosed the professional relationship on May 22, 2024. No recusal followed. Suhr moved to enter the Ortega conciliation report into evidence under procedural conditions that prevented the court from using it to contradict her plan. Source: March 14-15, 2024 trial transcript.

**46.** The racial motivation required by Section 1985(3) is documented. The C-word instruction was delivered to a Black father. The plan was adopted without the Black father's competing submissions. The documented deviations from the conciliation recommendations disadvantaged the Black father. The doctrinal religious framework was applied to a biracial child's formation without the Black father's participation. The professional network that produced these outcomes knew Plaintiff was a Black father from the first filing in this case.

**46a.** The professional network that built the appointment structure on March 4, 2024 was present in the official PC record on February 26, 2026. Source: E-0409REF; TR-0522; TR-0226.

**Count V — Breach of Contract**

**Against Defendants Meyer and Collaborative Success, Inc.**

**47.** Plaintiff incorporates all preceding paragraphs. The PC Agreement is a private contract. Meyer invoked it as binding to enforce the no-recording clause against Plaintiff while not treating its terms as binding when they limited her remedies. The following breaches are independently actionable:

**48.** (a) PC Agreement Section B.1 limits the non-payment remedy to referral to a collection attorney at the conclusion of the process. Defendants cancelled services mid-engagement on February 23, 2026. Source: E-0223R. (b) The Fee Schedule assigns OFW monitoring to flat monthly fee tiers ranging from $35 to $250 per month based on communication volume — explicitly not including responses or interventions which are charged separately. Defendants

billed OFW monitoring at the joint session hourly rate of $175 per hour on multiple charges. Billing a flat-fee service at an hourly rate is a violation of Defendants' own published fee schedule. Source: Fee Schedule 2025; INV-3901. (c) The Fee Schedule states joint sessions are billed at $175 per hour split between parties — Plaintiff's share is $87.50 per session. The confirmed positive balance on Plaintiff's account ran from December 1, 2025 ($209.25 remaining on the 4th PC Retainer, INV-3787) through January 27, 2026 ($143.87 confirmed, INV-3835) through February 26, 2026 when the remaining balance was consumed by charges from Plaintiff's unscheduled in-person visit (INV-3901) — a period of nearly three months. The child interview conducted November 25, 2025 was billed at $87.50 and paid from Plaintiff's own retainer on December 1, 2025 per INV-3787. Plaintiff funded the interview that produced the report withheld from him. The $209.25 balance confirmed on that same invoice was sufficient to cover two full joint sessions under Defendants' own published fee structure. Megan Klepacki's September 29, 2025 email states $150 was required prior to a joint session. Plaintiff's confirmed balance of $143.87 as of January 27, 2026 was $6.13 short of that threshold. Joint sessions were cancelled and Plaintiff was excluded from his daughter's educational proceedings over a $6.13 gap while $143.87 sat on account unused. Source: E-0929MK; INV-3787; INV-3835.  The payment plan Defendants cite as the basis for exclusion contains one stated consequence for non-payment: a 10% late fee on invoices more than 60 days past due. That provision is conjunctive — it requires both that payments have fallen behind AND that invoices have become more than 60 days past due without payment. Both conditions must be present simultaneously. Lump sum payments totaling $750 in October 2025 — made eight days after Megan's September 29, 2025 retainer email — prevented the 60-day threshold from being crossed. The late fee trigger never activated. Defendants' own payment plan document, which they quoted in the March 25, 2026 email as authority for exclusion, confirms the only authorized remedy is a 10% late fee. That remedy was never applied. Defendants proceeded directly to exclusion using a remedy the document does not authorize. Source: Payment Plan Agreement (signed Eric Porchia, September 2024); E-0325MB; E-0929MK.  The payment history Defendants submitted on March 25, 2026 to justify the exclusion contains a deliberate miscounting of the October 2025 payment. Defendants counted the $750 October payment as a single payment unit in their 19 of 33 compliance tally. Plaintiff's March 11, 2026 email — sent fourteen days before the March 25 submission, in the same email thread — states explicitly: "In November 2025, I made a $500

payment, which is equivalent to approximately five months of payments under that plan." Defendants read that email. They counted the $750 as one payment anyway. No legitimate billing system applies a lump sum payment as a single unit when the underlying obligation is periodic. $750 at $50 bi-weekly equals 15 payment periods. Counting it as one — after being told the correct math in writing in the same thread — is a deliberate choice, not an accounting error. The compliance picture built on that counting is a documented misrepresentation submitted to support a court report. Source: Plaintiff email March 11, 2026 6:48 PM; E-0325MB.  The payment history also contains a material date error: Meyer lists "September 29, 2024" as the date of Megan's email regarding the retainer balance. That email is dated September 29, 2025. The Megan Klepacki thread confirms the correct date. Transposing that date by one year misplaces a key event in the payment timeline — specifically, it obscures that a $750 payment followed eight days after that email, on October 7, 2025. The correct date establishes that Plaintiff made a substantial payment in direct response to the retainer conversation. The incorrect date severs that connection. The level of effort Defendants invested in the March 25 payment history — bold formatting, color highlights, detailed timeline — makes a one-year error on the single most consequential date implausible as oversight. Source: E-0929MK (September 29, 2025); E-0325MB payment history. (d) The Fee Schedule states late fees are waived when a signed payment plan is in place. Plaintiff had a documented signed payment plan confirmed active in writing on September 29, 2025. Source: E-0929MK. (e) Defendants withheld court-ordered PC functions — including the summer parenting determination and the child interview report — while prepaid retainer funds remained on account. Source: INV-3835; INV-3901. (f) Meyer enforced a no-recording clause against Plaintiff while operating her own Otter.ai recording system and while not enforcing that clause against Petitioner/Mother. Source: TR-1118; E-0312. (g) Meyer enforced the PC Agreement as binding when it restricted Plaintiff and did not treat it as binding when it restricted her, including the collection remedy limitation in Section B.1.

## VI. MONELL CLAIM AGAINST THE BOARD OF COUNTY COMMISSIONERS

**49.** The Board of County Commissioners of Sedgwick County, Kansas is liable under Monell v. Department of Social Services of New York, 436 U.S. 658 (1978) because the constitutional violations resulted from the official policy of the 18th Judicial District Court — specifically the PC Order, which appointed a coordinator through an adversarially controlled mechanism without

independent credential verification, and cited the housing clause the same court adopted as justification for the appointment. That official act is the moving force behind the documented violations.

**50.** Four independent paths to deliberate indifference are established:

**51.** First — prior business relationship: The county court appointed CSI's President and CEO as parenting coordinator through an adversarially controlled mechanism with no independent review of CSI's existing institutional relationship with the court through the mandatory co-parenting class program. A governmental entity that creates a prior business relationship with a corporate entity through its own mandatory program and then appoints that entity's principal as a neutral officer without independent conflict review does not need a history of prior complaints to establish deliberate indifference. Source: TR-0522; collaborativesuccess.com; PC Order April 11, 2024.

**52.** Second — financial interest: The Court Trustee collected 3.5% of every child support payment enforced throughout the engagement from April 2024 through January 31, 2026. That rate increased to 4.0% effective February 1, 2026. The support obligation is a mathematical output of the custody designation. A coordinator appointed through the county's own vendor relationship told Plaintiff not to pursue modification of that designation — sustaining the financial structure from which the county derives enforcement revenue. Source: K.S.A. § 20-380; dc18.org/court-trustee-nivd; Sedgwick County news release February 2026; TR-0226. The support obligation generating that enforcement revenue was calculated using a noncustodial designation applied to a parent the county's own appointed coordinator confirmed was not absent. Source: TR-0522. IV-D federal enforcement mechanisms — designed for absent parents — were entered at trial and apply to that obligation. Source: Trial record March 14-15, 2024; Parenting Plan March 4, 2024. The county collects enforcement revenue from a designation its own appointed officer documented as factually unsupported, on a parent that same officer told not to pursue modification of that designation.

**53.** Third — failure to train (authority misrepresentation): Meyer stated in writing on March 23, 2026 that non-payment constitutes non-participation as per the Court order — citing a private agreement as if it carried judicial authority while the PC Order's actual remedy went unacknowledged. A trained parenting coordinator knows the difference between a court order

and a private billing agreement. The county appointed a coordinator who did not apply that distinction in official written communications. Source: E-0323MB; PC Order Section 3.

**53a.** Third — failure to train (religious framework): Meyer disclosed that a doctrinal Christian program constitutes her world framework for all things. The county appointed a state actor whose disclosed operating framework is a religious program without ensuring she understood the constitutional constraints of state-delegated authority over citizens who did not consent to that framework. The county's mandatory co-parenting class for all divorcing families in Sedgwick County is developed and taught by Meyer — confirmed on CSI's own public website and the 18th Judicial District Court's website. Source: TR-0806; collaborativesuccess.com; dc18.org.

**53b.** Third — failure to train (fee structure): The county delegated authority through a court order requiring fees to be based on actual time expended under PC Order Section 23, but never reviewed whether the private fee structure was consistent with that requirement. The Fee Schedule charges flat monthly fees for OFW monitoring regardless of actual time expended — inconsistent with PC Order Section 23 on its face. The state created the delegation, required parties to pay through this private fee structure, and never verified the instrument through which its delegated authority was financially administered was lawful. Source: PC Order Section 23; Fee Schedule 2025; INV-3901.

**53c.** Third — failure to train (voluntary non-attendance): PC Order Section 5(e) provides that if a party chooses not to attend a scheduled conference, recommendations may be made without that party's input. Meyer applied this provision to justify proceeding without Plaintiff's participation after she excluded him through a payment ultimatum. Plaintiff did not choose not to attend — he stated his intention to attend in writing at 10:30 AM on March 25, 2026. Meyer cancelled the session after receiving his written confirmation of attendance. Coordinator-imposed exclusion is not voluntary non-attendance. The county appointed a coordinator who applied a voluntary non-attendance provision to justify proceeding without a parent she had excluded, and the court never verified she understood the scope of the provisions she was authorized to invoke. Source: PC Order Section 5(e); E-0325MB; Plaintiff email March 25, 2026 10:30 AM.

**54.** Fourth — implicit ratification: Meyer stated on May 22, 2024 that Judge Dewey had given her latitude in PC proceedings to bring parenting time modification recommendations as a standing practice. Source: TR-0522. A judicial officer who historically grants a coordinator

standing operational latitude has implicitly ratified that coordinator's expanded scope. The conduct documented in this complaint occurred in an environment where the coordinator did not face correction because the appointing officer had historically given her latitude.

55. Fifth — failure of the institutional oversight mechanism: PC Order Section 20 requires Meyer to file written reports or recommendations with the Court when there is going to be a change in court order or additional court order. That reporting requirement is the oversight mechanism the court built into the appointment — the instrument through which the 18th Judicial District Court was supposed to maintain supervision over the exercise of binding quasi-judicial authority it had delegated to a private officer. Meyer produced no written reports to Plaintiff and made no formal directives across the engagement from April 11, 2024 through the date of this filing. The court delegated authority. Required reporting as the oversight mechanism. And never verified that mechanism was being used. Nearly two years of unchecked exercise of binding state authority over a citizen's fundamental liberty interest passed without a single formal output reaching the party most directly affected. That is not Meyer failing individually. That is the institutional oversight structure the county created producing nothing — the moving force behind a court-appointed process that operated without judicial review or accountability for the full duration of the engagement. Source: PC Order Section 20; full billing record; full engagement record.

## VII. EXHAUSTION AND STATE REMEDIES

56. No administrative exhaustion is required for claims under 42 U.S.C. § 1983. Patsy v. Board of Regents, 457 U.S. 496 (1982).

57. This action does not challenge any state court judgment and does not ask this Court to review or reverse any state court ruling. The Rooker-Feldman doctrine does not bar this action. The constitutional violations alleged are independent acts occurring under color of the court-appointed process, not inextricably intertwined with any state court judgment.

58. No adequate state remedy exists. The coordinator's instruction and her session records are in the official state record and will remain there regardless of what happens to her appointment. Removing her does not remove what she said. It does not remove the record she built. It does not restore the time from April 11, 2024 through February 26, 2026, or the months since. The process that produced the violation cannot be the remedy for it. The state court is the court before

which Plaintiff appeared unrepresented at critical hearings. The federal court is not an alternative. It is the forum the Constitution requires.

## VIII. DAMAGES

**59.** As a direct and proximate result of the constitutional violations documented in this complaint, Plaintiff has suffered:

**60.** Deprivation of parenting time with his daughter from April 11, 2024 through the date of this filing under a custody designation produced by a constitutionally defective process, administered by a coordinator who confirmed Plaintiff was not absent and then suppressed his right to pursue modification. The developmental years during which a parent's presence shapes a child's formation are not recoverable. This harm is ongoing and irreparable. Source: TR-0522; TR-0226.

**60a.** The falsified official record Meyer is submitting to Judge Dewey travels into every future proceeding for the life of this case. Every modification hearing. Every enforcement action. Every future determination about N.J.P.'s education, medical care, and custody designation. The record does not expire when Meyer's appointment does. It precedes Plaintiff into every courtroom he enters on matters involving his daughter. No damages award restores a judicial officer's neutrality after exposure to false official findings. No monetary remedy corrects a record a judge has already reviewed. The harm is permanent from the moment the report is filed — and each challenge to it requires Plaintiff to invest time, money, and lost income to contest in a forum that has already been contaminated. The filing of this federal complaint is itself evidence of that injury: Plaintiff had to access a different judicial system to find a forum that has not already been shaped by the record Meyer built. Source: E-0325MB; PC Order Section 6; TR-0226.

**61.** Financial harm including retainer payments for services not delivered, a judicial lien on Plaintiff's home, the asset division leaving Plaintiff in documented financial precarity, a child support obligation calculated under a constitutionally defective process using a noncustodial designation applied to a parent the coordinator confirmed was not absent — the noncustodial label triggering IV-D federal enforcement mechanisms designed for absent parents, applied here to a parent the state's own appointed coordinator documented as present and engaged — and the investment restriction entered through a selective presentation of Plaintiff's financial history that omitted the period of documented peak performance. Source: Trial record March 14-15, 2024; MOJ August 28, 2024; TR-0522.

**62.** Credit damage resulting from the financial conditions this process contributed to producing — including a foreclosure proceeding requiring loan modification from an original interest rate of 1.9 percent to 5.5 percent over 40 years. The credit profile that qualified Plaintiff for 1.9 percent interest reflects years of financial management prior to this engagement. The modified loan terms represent a calculable lifetime financial consequence with a monthly payment differential of approximately $302 per month for the 40-year loan term. No damages award restores a credit score. This category of harm is ongoing, forward-looking, and not fully remediable by a monetary award.

**63.** Reputational harm through the housing clause characterization — a judicially sanctioned description that Plaintiff's housing situation required court intervention — sustained in the official record after Meyer confirmed on May 22, 2024 that the concern did not exist. Source: TR-0522; PC Order.

**64.** Such other compensatory and consequential damages as are proven at trial.

## IX. THE CONSTITUTIONAL INJURY: PATTERN, NOT INCIDENT

**65.** The constitutional violations documented in this complaint form a closed loop. The unrepresented party at trial produces a plan drafted by opposing counsel. The plan produces a custody designation. The custody designation produces a support obligation. The support obligation produces financial precarity. The financial precarity produces retainer default. Retainer default produces exclusion from the PC process. Exclusion produces a one-sided official record. The one-sided record produces findings that follow the child into every future proceeding. Modification requires a record. The record belongs to the coordinator. The coordinator said not to use the word.

**66.** The Sedgwick County Courthouse at 525 North Main, Wichita, Kansas concentrates every component of this process in a single location — the family law division, the Court Trustee enforcement office, the pro se help center, and the free legal assistance the state provides as an alternative to retained counsel. That office does not provide an email address. It requires physical presence. Plaintiff contacted the office by phone on multiple occasions and was informed on each occasion that the complexity of his case required an in-person consultation — no remote option was available. A bench warrant issued by the Court Trustee created a documented risk of arrest upon physical entry to that courthouse. The free legal assistance the state represents as

available was functionally inaccessible to the parent who needed it most because accessing it required entering the building where the warrant for his arrest had been issued.

**67.** No individual actor in this structure needed to intend harm. The structure created the incentives. The incentives produced the outcomes. The outcomes are documented. And the loop ran on a Black father who was documented as not absent by the state's own appointed neutral on the first day she met him.

## X. PRAYER FOR RELIEF

WHEREFORE, Plaintiff Eric Terrell Porchia respectfully requests that this Court:

A. Enter a preliminary injunction immediately enjoining Defendants Meyer and CSI from submitting any court communication about Plaintiff's participation, payment status, or compliance pending resolution of this action, and ordering preservation of all Otter.ai recordings, account data, access logs, and deletion logs pending discovery;

B. Enter a declaration that the PC Order as implemented violated Plaintiff's rights under the Equal Protection Clause, Due Process Clause, and First Amendment of the United States Constitution, so that this declaration may inform proceedings in the underlying state matter;

C. Award compensatory damages against all Defendants, jointly and severally, in an amount to be determined at trial;

D. Award punitive damages against Defendants Meyer, CSI, and Suhr in their individual capacities in an amount sufficient to deter similar conduct;

E. Award Plaintiff reasonable attorney fees and costs pursuant to 42 U.S.C. § 1988 as a prevailing party in this civil rights action, for this action and for all proceedings necessitated by the constitutional violations documented herein, including any future parenting coordination and custody proceedings made necessary by the violations alleged;

F. Order structural relief requiring independent oversight of the parenting coordination appointment process in the 18th Judicial District Court of Sedgwick County, Kansas;

G. Order a hearing on Plaintiff's motion for preliminary injunction within 14 days pursuant to D. Kan. Local Rule 7.1; and

H. Grant such other and further relief as this Court deems just and proper.

Respectfully submitted,

ERIC TERRELL PORCHIA

6213 East 12th Street North

Wichita, Kansas 67208

nae.porchia@gmail.com

(816) 813-9587

Plaintiff, Pro Se

Date: March 27, 2026

**JURY TRIAL DEMANDED**

**CERTIFICATE OF SERVICE**

I certify that on the date of filing, a copy of this Complaint was served on each Defendant or their counsel of record by certified mail, return receipt requested, at the addresses identified in the Parties section of this Complaint.